Good morning, Your Honor. May it please the court. My name is Jack Peacock and I'm with the law firm of Gagnon, Peacock & Varecki in Dallas, and I represent Master Sergeant Lester Rummans, and I appreciate the opportunity to present our appeal to this court. To begin with, as the court knows, this case is about a veteran's guidelines whenever there is a possible situation of foreclosure, and as the court knows, our military is called up fairly often, especially the reservists, and so they need these kinds of protections, the SACRA protections and the veterans' guidelines that are set forth in the either, usually they're in their deed of trust or they're in the note. In this case, they're in the note. It says that the veterans' rules, regulations, laws are governing. And so what do we have here today? We have a situation where Master Sergeant Rummans, who is now retired, served over 30 years, was called up numerous times and got behind on his mortgage. When was the last time that he made a payment on the mortgage? Well, that's actually not in the record. What is in the record is that the way that the lenders compute that is, for example, like in his case, if I started getting behind early on, but I continue to make payments when I can, what the lenders do is they apply those payments to the ones that were made back in the day when they were regular. So the way that they computed it, his last payment had been in 2006. So that doesn't really tell us when his last payment was. It just says that the last time period where they computed it was 2006. So there's no record, one way or the other, of any payments after 2006? I'm just asking you about what's in the record. I don't recall seeing anything after that time period where they consolidated it and said, for purposes of the payment history, they log it in that way and it's 2006 is the last. And tell us about Mr. Rummans' occupancy in this particular location. Is he continuing to live there? No, he was evicted. The purchaser at the foreclosure sale didn't wait for a decision by this court. He was evicted last year. All right. So he continued living there for 15 or 20 years after there was an issue about payment. Is that correct? Well, when he was there, he was not there a lot. The record shows that he was not there a lot because he was called up to, as the court knows, this nation has a war about every four or five years. And that's not a criticism. It's just the history. And I mean, I'm a veteran. I know that. And that's just the way it is. So he was called up a number of times. And unfortunately, GIs get behind on their mortgages when they're overseas. It just happens. That's why we have these protections. Okay. I think you've made that point. So why don't you move on to any other points that you want to raise? Yes. Thank you, Your Honor. And so the issue here was whether the lender followed the guidelines. And our position is that they didn't. The particular guidelines that I want to point to the court are in 38 CFR 36.4350H. And I'll just read that because it's very relevant to where we are here today. It says, subsection H is conducting interviews with delinquent borrowers. When personal contact with the borrowers, in parentheses, is established, which it was in this case, on occasion it was established. And I'll talk about that. The holder shall solicit sufficient information to properly evaluate the prospects for curing the default and whether the granting of forbearance or other relief assistance would be appropriate. At a minimum, the holder must make a reasonable effort to establish the following. Number one, the reason for the default and whether the reason constitutes a temporary or permanent condition. Number two, the borrower's present income and employment. Number three, the current monthly expenses of the borrower, including all household and debt obligations. Number four, the borrower's current mailing address and telephone number and a realistic and mutual satisfactory arrangement for curing the default, if applicable. Our point and our position is, Your Honor, the lender didn't do that. Now, what did the evidence show? The evidence showed that during the trial, I called the corporate representative for the lender under the adverse witness rule. And to my surprise, and I think to the surprise of the court, he was not knowledgeable on whether the lender had complied with this regulation. His name was Mr. Kevin Payne. And I cross-examined him for a time period. And what it showed was, with my cross-examination and the court's cross-examination, I think the court did a better job of cross-examining him than I did. But the court inquired about his knowledge of whether there was compliance. Now, number one, I did say that I was going to comment about the first part, about the solicitation of Mr. Rummans. And I know that Mr. Payne said, well, we tried calling him 84 times, and there was no answer. Or if there was an answer, he just wanted to talk about SACRA. Well, when Mr. Rummans testified, he said that all of those calls are robo-calls, but he did get to talk to a person three times. And he did mention SACRA. But here's the interesting point. Nowhere in any of those discussions, nowhere in the record is it indicated that in any of those phone calls, the lender complied with this section 38.36.4350H. Nothing. So what was the evidence about mailing any kind of a notice or any other communication from the holder or the lender or whatever? Yes. All right. And that was going to be my next point. The interesting thing was the lender tried to make their compliance with this statute with letters. And the problem with that is that Mr. Rummans testified that he didn't receive those letters. Now, so then it becomes incumbent upon the lender to show that the letters that they say that they mailed were mailed. And that's where they came up short. They couldn't prove that they actually mailed the letters. And the problem was that Mr. Payne testified that number one, he never worked for SLS. SLS was the servicer. And number two, he knew that SLS had contracted with a third party to do mailing. And during the court's cross-examination of Mr. Payne, the court got to the bottom of the issue. And that was that he didn't know what their mailing procedure was. He had no clue. He couldn't testify about it. So they don't get the presumption of receipt by mailing. They don't get the mailbox rule. And the Texas rule is real simple on that. Texas has a rule regarding that. And it's in the Scottsdale case. That Texas rule is quoted in there. And I will share it with the court here, word for word. Here it is. It's in, by the way, it's in page 500 of the Scottsdale case. The Texas rule is that when a sender relies on office custom to raise a rebuttable presumption of mailing, it must offer corroborating evidence to support the inference that the custom was carried out. All right. So what do we have here? Number one, Mr. Payne couldn't testify about what the custom was at Covius, who was the third party contractor mailing, that was supposed to be mailing of the letters. So how could there be any corroborating evidence when he didn't even know what the custom was? So they just didn't get there. They never proved mailing. And it was their burden to do that, their duty to do that. And they didn't do it. So there was no evidence of mailing. So where does that leave them? That leaves them without proof of compliance with the VA regulations. They just failed. And I'm sorry that they failed. As to the phone calls, I read somewhere there was evidence that on some of the phone calls that Mr. Rowans would answer the call for some short period of time and then hang up. Was there evidence about that? Well, I don't remember that. I don't remember that, Your Honor, that he... You don't remember the evidence about the... I mean, did you try the case? I did. All right. You don't remember whether there was any evidence about what happened with those phone calls, whether he picked up the phone and answered or said anything or responded or hung up right away? You just don't remember that? I remember. I will tell the court what I do remember. And what I do remember is that he said that he talked to him three different times, a real person, and that whenever he spoke to them, what he got from them was hostility. And he was basically... What's the word I'm looking for? Humiliated. There was no effort to... In the record, there is no showing that at any time in those three phone calls that he did have with... And he wanted to speak to a supervisor. And I think he testified on one occasion, he did speak to a supervisor. And at no time did they ever comply with this statute about asking him about, well, what is your income? What is your expenses? What is the likelihood that we can resolve this? There's a number of ways that these cases can be resolved. Let me just clarify one thing. What does the record show was the date of his last payment? How long did he live there and not make payments is what I'm getting at. Well, it's my understanding that he made payments off and on when he was... I don't remember when his last payment was. All I know is that the lender testified that according to their records, they're showing the last complete time of payment at 2006. Okay. So the record shows that as you read the record, it is that the man's living... I'm sympathetic to the protection of veterans, of course. But at the same time, you know, if it's the case that he's in there since 2006 and he's made no payments, then that's kind of difficult to swallow. You don't ignore your mortgage for, you know, for 10, 15 years with no consequences. Well, and I agree with that, Your Honor. Certainly, there has to be fairness, and I agree with that. What I do know from the record is that he was... But the fairness is you pay your bills. Yes. Except with the protections that if you pulled him out of duty, that can interrupt it. And I'm in full agreement with that, Your Honor. But everybody has to pay their bills. And there are ways that situations like this can be resolved if the lender has to reach out and say, okay, let me know what your income is, what your expenses are, and see how we can resolve this. Because the note hadn't matured yet. I mean, there was time in the note to do some things. And not only that, these lenders have the authority in a loan modification, which they can do. That's the other side of the coin, and we're going to ask him what they were doing to collect the money. Okay. Looks like I see a red light here. Yes. You've got a question? May it please the court. My name is Matt Manning with Hush Blackwell of Houston, and I'm here representing the appellees, HSBC Bank USA, SLS, now Neurance. Justices, the question before the court today is whether or not the appellees made reasonable efforts to engage with Mr. Rummans prior to the foreclosure of his home. Appellees contend that the record demonstrates the answer to that question is a resounding yes. Over the course of three years, SLS made 84 phone calls to Mr. Rummans, three of which were answered. In addition, SLS mailed 12 letters to Mr. Rummans. What's the time span of those calls? The calls, Your Honor, it was... Would you say 83 calls over what period of time? It was three years, Judge. It was from 2019 to July... And no payments were being made during that time? No, Your Honor. How long of time was there with no payment? 16 years. How much? 16 years, Your Honor. 16 years. Okay. Justices, I believe the appropriate standard here is clear error. This was a bench trial, and that is particularly pertinent on appeal. As the court is well aware, the standard is clear error for findings of fact and de novo for questions of law. The appellants, to prevail, need to somehow convince this court that this case was about a question of law, but it wasn't. It was a factual finding by Judge Nguyen after two days of a bench trial where, as Mr. Peacock mentioned, she had the opportunity to herself question thoroughly both SLS's witness and corporate representative Kevin Payne, as well as Mr. Rummans. She made the reasoned decision after that bench trial and after requesting post-trial briefing on the issue that brings us here, or at least one of the issues, the mailbox rule, to make a factual finding that mailing occurred of those 12 letters. However, I want to pivot immediately to Justice Smith's question regarding the telephone calls. Mr. Peacock mentioned that there was no record of Mr. Rummans implicated, 38 CFR 36 4350H. I would respectfully disagree, and the record, I believe, will bear that out. In fact, I'd cite the court to record on appeal 1495 to 1499. In those series of the record, the trial transcript, Mr. Rummans testified that he spoke to SLS representatives on three occasions. Two of those calls, Mr. Rummans testified, and Mr. Payne corroborated the substance of those calls, and that was the SCRA protections. Mr. Rummans felt strongly, based on a prior conversation he'd had with a prior lender, that the SCRA protected him from foreclosure. However, at the time, he was discharged in 2020, and these calls, I believe, occurred after that point. But he's admitted, and Mr. Payne's notes, the review of business records of SLS, corroborated those discussions. Talking about the SCRA by Mr. Rummans and refusal to discuss any other item amounts to a frustration of SLS's attempts to go through the subsections of H, 1 through 5. In addition, the other call that Mr. Peacock mentioned, I'd like to elaborate on. Mr. Rummans explicitly testified that he spoke to, he referred to her at two different ways, a vice president of operations and a vice president of service. And the substance of that call, and I believe it's in the same record citation, but, and I'm paraphrasing the quote, is he said, the call with her was going to get me back on track and put me in good standing. That is exactly the type of discussion that subsection H5 requires. And so on an appellant's own testimony, SLS satisfied a subsection H5. I'd also like to point out while I'm on the subject of the phone calls, justices, that the subsection G of the same regulation is also particularly pertinent, even though most of the time during the trial was spent on subsection H. G, which provides for collections actions, which this was, requires a sequential series of contacts, 1 through 4 actually, but of particular relevance is the first three. And they are dependent on one another to trigger. So the first sub point under G1 is that the servicer is supposed to make phone calls to try and attempt to dialogue and have the discussions that are described by H. If they are unable to make the phone calls and make contact, then they are required to send letters. That's the second point. Then if they are unable to make contact, they are then required to attempt to arrange a face-to-face meeting. During the trial, there was a series of questions by Judge Lynn to Mr. Peacock about a line of questioning that Mr. Peacock was engaging in regarding whether or not the personal contact requirement of subsection H meant an in-person meeting. I believe that if the court reviews G and H in tandem, they will arrive at the conclusion that Judge Lynn did, which is that no face-to-face meeting is required. That independently the telephone contacts, if made, and if the topics delineated in subsection H are had, then the servicer has satisfied the requirements. This court need never get into the likely reason that we are here today, which is the mailbox rule. That doesn't even need to come into play. But with respect to the mailbox rule, the judges, I would like to say that an appellant is going to need to try and remove this from a factual finding, which I would submit again that it is. He has to establish that or he's trying to establish that he refers to as a presumption of mailing, but Judge Lynn indicated in comments from the bench that there is no presumption of mailing. What we have is the establishment of facts, evidence, that gives rise to the presumption of mailing. And while Mr. Peacock characterizes the record as without evidence that SLS complied with the evidentiary standard, I would respectfully disagree. Mr. Payne testified significantly on this issue. And in particular, I'd like to cite to the court record on appeal 1644 to 1646, as well as record on appeal 1654. The testimony there, it shows what SLS did and what Mr. Payne specifically did to prepare for his testimony. What he did was he talked to former employees of SLS. SLS merged with New Rez, and as Mr. Peacock pointed out, Mr. Payne was indeed never an employee of SLS. But he did more than a lot of corporate representatives and a lot of affiance in some of these business records affidavits did. He went and he made an independent investigation. And he spoke to SLS employees and reviewed SLS's records, which under Klein are incorporated into New Rez's records. And his findings were that when SLS provided the mailouts, the mailing list to Covius, their third-party vendor, that the process was that prior to mailing, the letters would be barcoded, marked with barcoded, the delineated information, mailed out, and then be returned into SLS's system, uploaded. The testimony reflects that it was that system that they relied on, SLS relied on, to show that mailing had occurred. So rather than indicating that there is significant amounts of evidence, and Mr. Payne testified to that information ad nauseum. And so the question then becomes, what did Judge Lynn base her ruling on? As Mr. Peacock in his rebuttal will undoubtedly discuss, Judge Lynn herself had some severe concerns about whether or not the mailing standard was met. She took Mr. Payne on an extensive amount of Though it's not particularly helpful to our position, I would concede that the record indicates that he had no knowledge of what Covius's procedures were. He had industry experience. He had worked in mailrooms. He'd been doing this for 30 years. He knew that this was a commercial vendor whose whole point was mailing, but he wasn't there. But this court's rulings, and the rulings of the district courts in this circuit, and the rulings of the state of Texas, don't require personal knowledge. It has been held time and time again. The personal knowledge is not required, but a review of business records is sufficient. And that's what Mr. Payne testified to. That's what Judge Lynn cross-examined him on pretty extensively. And questions remained for Judge Lynn. And so what she did was at the conclusion of evidence in the close of trial, she ordered post-judgment briefing. And the post-judgment briefing was on the mailbox rule. The parties were told to submit their best cases. They did. And Judge Lynn came back with a factual finding. And that factual finding has to be a factual finding because appellants on appeal have waived any argument that it isn't a factual finding. And I'd cite the court to record on appeal 1093 to 1100, which is the joint pretrial order signed by the court and by all counsel, including Mr. Peacock, as well as record on appeal 1118 to 1124, appellants proposed findings of fact and conclusions of law. In both of those documents, the issue of mailing is listed as a contested issue of fact, agreed upon, endorsed by the appellant and the appellant's counsel. So to come in here today and make any attempt to say that this is a question of law about the presumption of mailing has been waived. As a separate and independent basis for this court making its ruling, as this court, again, is well aware, it has the ability to affirm the ruling on any basis that is demonstrated thoroughly in the record. I would cite the court to record on appeal 438. The entirety of the document is 435 to 442, but the particular part of that document that I would like to discuss is 438. That item is an affidavit that was attached to the foreclosure sale deed that was in turn attached to Mr. Rummins' declaration, which was in turn attached to Mr. Rummins' response in opposition to SLS's summary judgment. This is Mr. Rummins' own evidence, and the substance of that affidavit is from an attorney by the name of L. Keller Mackey. Mr. Mackey is a principal at Mackey, Wolfe, Zines, and Mann, which is foreclosure counsel, and they were foreclosure counsel for SLS in this instance. If the court will review that affidavit, it indicates that all notices required by the deed of trust and by Texas Property Code 51002 have been mailed. That means that that is an entirely independent basis. Apologies, Your Honors. I was on the briefs, but didn't catch it until preparation for oral argument, but that is an entirely independent basis for finding that appellees can prevail without the need for anything. It was uncontested that this affidavit was signed as a consequence of the approving of the foreclosure and the notices that are required there under, and at trial, they never raised that issue. So that is a wholly independent basis for this court to affirm the trial court's ruling. The telephone calls are a wholly independent basis for the trial court's ruling. Judge Lynn's finding of facts, very clear, that she didn't engage in the presumption. Once the court, or when the court has the opportunity to review the cases in this regard, I believe that the evidence that we submitted in our appellees' briefing, or apologies, not the evidence, the case citations that we submitted in the appellees' briefing, the cases relied on in the post-trial briefing, the cases of this circuit, the ones relied on by the appellant, Duran, Scottsdale, those are the only two cases that are cited in appellant's reply brief. They are in opposite because those were under a different Those were a summary judgment standard. In our instance, obviously, we had a bench trial. The closest analog, and I think the strongest case for appellees, is the Ben Kozlov opinion. That was a jury trial that went on appeal, and it had a, well, I would say a lower evidentiary threshold for demonstrating that the mailing presumption occurred, or that there were facts giving rise to a factual finding, which the jury did find, that mailing occurred. In that case, the principal, Ben Kozlov, just noticed that the letter had been stuffed and was prepared for postage, and that it was not returned. Oh, and he testified that it was sent similarly to a prior letter or notice in the case. That was it. That standard that evidentiary showing is far lower than the evidentiary showing that SLS and HSBC Bank have demonstrated in this case. Our showing hits the boxes of this court's opinions and the district court's opinions of this circuit, and under Texas law, that mailing occurred because of the business records that were relied on and incorporated into new residence records. That Mr. Payne has the ability to review those records and indicate by his review of those, and with corroborating evidence, that the mailing occurred. And the corroborating evidence here is much stronger than that in Ben Kozlov. Justices, for all of those reasons, I would submit that there are independent grounds for affirming the trial court's ruling that the telephone calls, the totality of the circumstances, the mail outs, SLS did what it could to try and correspond and engage with Mr. Romans to ensure that they met the requirements under 38 CFR 4350, 364350. You initially, or at some point, filed a counterclaim for frivolous suit. Is that right? Yes, Your Honor. Tell us what happened to that. My recollection is that, Your Honor, to be honest, I just, I don't know. I noticed that a counterclaim was filed, but I didn't track it as I was preparing. All right. All right. Thank you, Mr. Payne. Thank you, Your Honors. Mr. Peacock for rebuttal. Yes, Your Honors. Judge Lynn said it was waived, the frivolous, the counterclaim for frivolous suit. Okay. Now, going to some of the points that counsel Averly made, I think I want to start out with what the very last part of Mr. Payne's, the corporate representative's testimony, and I thought this was great for us. Anyway, it's in the record on page 1641, and it's Judge Lynn speaking to Mr. Payne while he's on the witness stand. She said, I don't want you to guess. I don't want you to tell me, well, that's their job, so they must have done it. That's not what I want to know from you. I want to know what you know about what they actually did, and she's talking about Covius, the firm that was hired to do the mailing. That's Judge Lynn talking. Yes, Judge Lynn talking. Anyway, his answer was, if we're talking Covius, I can't give you an answer, and the judge said, okay, and then he said, I don't know exactly how the letters are mailed. That's his testimony. I don't know how they ... And counsel ably tries to point out the affidavit from the foreclosure council, but number one, that affidavit is certainly conclusory, as the court probably noted, but even if it's not, still, the affidavit that that refers to about notices that were sent, as the court knows in all foreclosures, certain notices have to be sent, like, for example, the notes accelerated, and number two, the posting of notice of the trustee's sale. Okay, that's what that's referring to. It's not referring to regarding compliance with VA guidelines. Secondly, counsel referred to the brief discussion that Mr. Rummins had with the vice president of operations there at SLS, and Mr. Rummins testified about that, and he said in his testimony, he was happy to talk to somebody that sounded like they knew what they were doing and would try to help, but the extent of that conversation was that the vice president of operations was simply that she would try to help, and that was it. There was no compliance with all of these requirements in the statute that says this is the minimum that they must do. They need to find out the income, expenses, the mailing address, and this mailing thing would have certainly come up, and ways to deal with that. So, I agree with you when you say that, well, he's way behind, something needs to be done. I agree with that, but the VA provisions provide that there is a way to do this. So, suppose that we were to agree with you on everything you've said. I'm not suggesting what we're going to do. What relief do you say your client is entitled to as of now? Yes, all right, and that's in the prayer in my final brief where I outline that, but what we would ask for is reverse and remand with instructions to set aside the foreclosure and reinstate the deed of trust and note, and what that does is that doesn't hurt anybody, and as far as the person that certainly hurts the person that bought the house, and that is in, I didn't bring it up here with me, but it's the very last exhibit to all the exhibits, the trial exhibits. I can give you the, let me, may I go back to my desk? Yes, you may. There's a provision that protects a person that buys property at a foreclosure sale. There's actually several provisions. There's one in the property code, but if you look at, it's called defendant's exhibit number two, and it's the exhibit of North Sky, the firm that bought the property. In that document, in the third paragraph, it deals with that issue. If the title, if his title fails, then, oh, I'm sorry, I've got a red light. No, no, that's okay. You can go ahead and answer that, and I think it's, and it says that he gets all of his money back from the lender, so what it does, what it effectively does is puts everybody back, and yes, Mr. Rummans would be way behind, but there are ways and methods where that can be remedied if the parties, if the lender complies with this very last part of the minimum requirements, and that is to try to do a realistic and mutually satisfactory arrangement for curing the default. That can be done, and it's done every day. I just have one quick final question. I'm looking at page 489 of the record, and this is Judge Lynn's order where she denies the defendant's motion to dismiss. It's one sentence, and it's summary. Did she say anything to explain why the suit wasn't dismissed as frivolous at the very outset? This is dated January 16th, 2024, or is this the only explanation that we have? I believe it's the only explanation, Your Honor. Thank you, sir. All right, thank you. Your case is under submission. Thank you, Your Honor. And the Court will take a brief recess before hearing the final two cases. Thank you.